UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AUG 1 9 2022

---

JON LACKNER,

       Plaintiff,

   v.

UNITED STATES OF AMERICA, MICHAEL
CARVAJAL, in his individual capacity and
his capacity as Director of the Bureau of
Prisons, NICOLE ENGLISH, in her individual
capacity and her capacity as Northeast
Regional Director, DAVID E. ORTIZ, in his
individual capacity and his capacity as
Warden of the Federal Correctional
Institution, Fort Dix, LAMINE N'DIAYE, in
his individual capacity and his capacity
as Warden of the Federal Correctional
Institution, Fort Dix, and KIMBERLY
KODGER, in her individual capacity and her
capacity as Associate Wardemn of the
Federal Correctional Institution, Fort
Dix.

       Defendants.

---

COMPLAINT

---

Jon Lackner, Plaintiff pro se, hereby alleges as follows:

1

1.    Life changed in the United States when COVID-19 struck.  Pandemic protocol called for protective face coverings, frequent hand washing, and the use of hand sanitizer and cleaning products to avoid spreading the deadly virus.  Social distancing was recommended nearly everywhere.

2.    From the beginning the public was guided by medical and scientific experts who emphasized the importance of adhering to the protocols to slow the spread of COVID-19, so as not to overwhelm hospitals' ability to cope. Unfortunately, the inmates at the Federal Correctional Institution ("FCI") in Fort Dix, New Jersey (hereafter "Fort Dix") were unprotected and unable to protect themselves because the Defendants ignored the safety procedures which would have protected prisoners from the novel coronavirus 2019 ("COVID-19").

3.    Because of the isolated nature of prisons, the Federal Bureau of Prisons (hereafter "BOP") had a perfect laboratory situation at Fort Dix in which it would have been impossible for any inmate to become infected without the BOP introducing the virus to the inmate population.  All the BOP had to do was take the reasonable step of testing anyone who would be exposed to their vulnerable masses, and - in the event of a COVID-positive person slipping through, provide Personal Protective Equipment ("PPE") to both staff and inmates.  If BOP staff and officials had only done these things and the virus still got through - no body would have faulted them for doing everything they could.

4.    The Defendants named here failed to heed public demand that they protect inmates, and contravened federal guidelines by transferring hundreds of federal prisoners without requisite safety protocols, from the Federal Correctional Institution Elkton (hereinafter "FCI Elkton"), an institution suffering from a massive COVID-19 outbreak, into Fort Dix.  This was done

2

from September 28, 2020 to October 28, 2020, without implementing basic health guidance once COVID-19 entered Fort Dix's facility. The result was nearly 2,000 prisoners contracting the virus in the four months following the FCI Elkton transfers, and two inmate deaths.

5. As has been noted in multiple federal courts and widely reported in the press, the Defendants' actions and inaction caused a public health crisis, as the virus spread unchecked at Fort Dix for months. Defendants engaged in practices that negligently exposed Fort Dix prisoners to unacceptable health risks including but not limited to:

a. Transferring prisoners into Fort Dix without adequate measures to prevent the spread of COVID-19;

b. Failing to separate or quarantine COVID-19 positive prisoners and newly arrived transferees;

c. Transferring prisoners between units at Fort Dix without adequate steps to prevent the spread of COVID-19;

d. Declining to enforce mask mandates for staff and prisoners;

e. Declining appropriate screening tests;

f. Decreasing social distancing and interpersonal space by condensing inmates together. In some instances they condensed COVID-negative inmates with COVID-positive inmates.

6. Because Defendants failed to take adequate measures to control the spread of COVID-19 through passive inaction, and in some instances actively facilitated COVID-19 spread through their actions, Fort Dix has and continues to suffer. Accordingly, Jon Lackner brings this suit pursuant to 28 U.S.C § 2674, the Federal Tort Claims Act ("FTCA") for the negligent and wrongful acts of the United States, its agents, employees, and contractors working under color of federal law.

## JURISDICTION AND VENUE

7. The Plaintiff brings this action against the United States

3

pursuant to the FTCA.

8.     This Court has jurisdiction pursuant to 28 U.S.C §§ 1331 and 1346(b)(1).

9.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district wherein the acts and omissions complained of occurred.

PARTIES

10.     Plaintiff is an individual who contracted COVID-19 while imprisoned at Fort Dix following four prisoner transfers from FCI Elkton, September 28, 2020 to October 28, 2020.   The named Plaintiff contracted COVID-19 and had medical conditions which placed him at increased risk for a severe reaction, according to the Centers for Disease Control and Prevention ("CDC").

11.     Plaintiff Lackner, BOP Register Number 64563-066, is a 58-year-old man housed in the West compound of Fort Dix.   Plaintiff Lackner suffers from Cardiovascular Disease, Arteriosclerosis, Hypertension, Hyperlipidemia, Localized Severe Osteoarthritis, a Body Mass Index (BMI) above 30, and is a former smoker.   Just prior to Plaintiff Lackner contracting COVID-19, he was forcibly dislocated from his singly-occupied 2-man room and placed into a fully-occupied 12-man room (more on this event is discussed later, starting at paragraph 89).   Plaintiff Lackner suffered extreme anxiety over his eviction, his now much harsher living conditions, and his worry about contracting the virus when squeezed together with unidentified newly-infected inmates who were certainly present in unknown numbers.   After contracting the virus, in addition to Plaintiff Lackner's mental and

4

emotional distress over how severe his reaction would eventually be, he suffered aches, chills, sweats, and loss of taste and smell. Because Defendants and their agents did not follow COVID-19 protocols or protect Plaintiff Lackner from COVID-19 and caused him harm, he filed an administrative complaint pursuant to the FTCA.

12. Defendant David E. Ortiz was the Warden at Fort Dix from January 2020 until February 2021. As Warden, Defendant Ortiz was responsible for and oversaw all day-to-day activity at Fort Dix. He was in charge of all aspects of the operations and functions of Fort Dix. His responsibilities included ensuring the safety of all prisoners and staff at the institution and ensuring that the institution operated in an orderly fashion. Defendant Ortiz was aware of and adopted and enforced policies that left Plaintiff and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

13. Defendant Lamine N'Diaye is the former Warden at Fort Dix and on information and belief was the acting Warden at Fort Dix from February 2021 to April 2022. As Warden, Defendant N'Diaye was responsible for overseeing the day-to-day activities at Fort Dix. His responsibilities included ensuring the safety of all prisoners and staff at the institution and ensuring that the institution was operating in an orderly fashion. Defendant N'Diaye was aware of and adopted and enforced policies that left Plaintiff and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

14. Defendant Kimberly Kodger was, at all times relevant to this Complaint, an Associate Warden to Fort Dix. As Associate Warden, Defendant Kodger managed and oversaw the day-to-day activities at Fort Dix. She was

5

responsible for administering Fort Dix policies and procedures and supervising housing, security and facility operations. Defendant Kodger was aware of and adhered to policies that left Plaintiff and all those similarly situated exposed to infection, severe illness, and death due to COVID-19

15.   Defendant Nicole English was, at all times relevant to this Complaint, the Director of the Northeast Regional Office of the Federal Bureau of Prisons. As Northeast Regional Director, Defendant English oversaw the operations of the 19 Bureau of Prisons facilities, including Fort Dix. Defendant English was responsible for the oversight and management of more than 21,000 prisoners. Her responsibilities included ensuring the safety of all prisoners and staff in the institutions she oversaw and ensuring that the institutions operated in an orderly fashion. Defendant English was aware of and adopted and enforced policies that left Plaintiff and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

16.   Defendant Michael Carvajal was, at all times relevant to this Complaint, the Director of the Federal Bureau of Prisons. As Director, Defendant Carvajal was responsible for all BOP policies implemented at Fort Dix, including those pertaining to prisoner transfers and COVID-19 protocols. His responsibilities included ensuring the safety of all prisoners and staff in BOP system and ensuring that institutions operated in an orderly fashion. Defendant Carvajal was aware of and has adopted and adhered to and/or enforced policies that left Plantiff and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

17.   The United States, as sovereign, is immune from suit except as it consents under the FTCA's limited waiver of sovereign immunity permitting lawsuits against the United States for torts perpetrated by government

6

employees.   At all times material hereto, Defendant United States owned and operated Federal Correctional Institution Fort Dix, in New Jersey and is accordingly the appropriate Defendant under the FTCA.

FACTUAL ALLEGATIONS

## I.   THE COVID-19 PANDEMIC POSED A GRAVE RISK TO HEALTH.

18.   The highly contagious novel coronavirus, and its resulting infection, COVID-19, has led to a global pandemic causing the spread of the disease worldwide.   COVID-19 spreads primarily through droplets of saliva or discharge from the nose which are inhaled or transferred from surfaces. [CDC, Scientific Brief: **SARS-CoV-2 Transmission,** January 25, 2022)]   Studies demonstrate that infected persons may never show symptoms, but can nevertheless transmit the virus to others. [Katherine Harmon Courage, **How People Are Spreading Covid-19 Without Symptoms, Vox** (April 22, 2020)]

19.   The CDC explains that COVID-19 can be spread through airborne or aerosolized transmission and that "fine droplets ... can remain suspended in the air for minutes to hours." [id.]   The "[r]isk of transmission" of fine COVID-19 droplets "is greatest within three to six feet of an infectious source where the concentration of these very fine droplets and particles is greatest." [id.]   While scientists still have questions about the transmission of COVID-19, "the available evidence continues to demonstrate that existing recommendations to prevent [COVID-19] transmission remain effective."   That is, "physical distancing, community use of well-fitting masks ... adequate ventilation, and avoidance of crowded indoor spaces" will all "reduce the transmission" of COVID-19. [id.]

20.   As of August 3, 2022, there have been nearly 580 million reported COVID-19 cases globally and 6.41 million deaths resulting from the virus.

7

[World Health Organization, **Coronavirus (COVID-19) Dashboard,** https://covid19.who.int/ (last accessed August 3, 2022)]

21. The first known case of COVID-19 was reported in the United States on January 21, 2020. Since that time, 91.5 million cases have been reported in the United States, and 1.03 million people have died. [Centers for Disease Control, **United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATS) by State, Territory, and Jurisdiction** (last accessed August 3, 2022)

22. New Jersey has reported 2.6 million COVID-19 cases and over the course of the pandemic, over 34,290 people in New Jersey has succumbed to the virus. [New Jersey Health, **New Jersey COVID-19 Dashboard** (last accessed August 3, 2022)] Of the total reported cases in New Jersey, 121,000 have been reported in Burlington County, where Fort Dix is located. [See id.; see also Fed. Bureau of Prisons, **FCI Fort Dix,** (last accessed August 3, 2022)]

23. The virus poses a grave risk of severe illness, including lung tissue damage, sometimes leading to permanent loss of respiratory capacity. [Simon Balogun, Oyeronke Williams and Olusegun Ojo, **Pulmonary Fibrosis In COVID-19 Survivors: Predictive Factors And Risk Reduction Strategies, Hindawi Journal** (August 11, 2020)] It can also cause acute respiratory distress syndrome, affect cardiac functions, lead to severe damage to other organs, and cause life-threatening blood clots. [Declaration of Dr. Jonathan Louis Golob, Dawson v. Asher, Case No. 2:20-cv-00409-JLR-MAT (D.Or. Filed March 16, 2020), ECF No. 5]

24. Persons over the age of 50 are particularly at risk (accounting for 95% of COVID-19 deaths), as are those with certain underlying conditions, most commonly, hypertension, obesity, diabetes, lung disease, and cardiovascular disease. [CDC, **Medical Conditions** (last accessed August 3, 2022)] "Adults of any age" with underlying conditions are "more likely to

8

get severely ill from COVID-19." [id.]   That is, they may need "hospitalization," "intensive care," "a ventilator to help them breathe," and "they may even die." [id.]

25.   A mild or moderate COVID-19 infection usually "lasts about two weeks" but others experience "lingering health problems even when they have recovered from the acute phase of the illness." [Tae Chung, Amanda Morrow, Emily Birgham, et al., **COVID 'Long Haulers': Long-Term Effects Of COVID-19**, John Hopkins Medical (April 1, 2021)  People who have "long-term COVID-19" will test negative for COVID-19, "but they might be severely debilitated nonetheless." [id.]   While there is a clear link between severe COVID-19 illness and people with certain underlying conditions, "there isn't a clear link" between underlying health conditions and "long-term problems." [id.] Rather, "long [COVID-19] can happen in people who have mild symptoms" and no underlying health conditions. [id.]

26.   The CDC reports th at "the most common lasting [COVID-19] symptoms are fatigue, shortness of breath, cough, joint pain and chest pain." [CDC, **Post-COVID Conditions** (last accessed August 3, 2022)  But other symptoms include depression, muscle pain, headache, intermittent fever, and cognitive problems. [id.]

27.   Numerous studies reveal extremely high rates of post-traumatic stress disorder ("PTSD"), depression, anxiety, substance abuse, and suicidal thoughts in adults who have contracted COVID-19.   One study of 381 patients who recovered from COVID-19 found that four months after their recovery, 30.12% (115 patients) suffered from PTSD, 17.2% (66 participants) from depression, 7% (27 participants) from anxiety disorder, and 0.2% (one participant) were considered psychotic. [Delfina Janiri, Angelo Carfi,

9

Georgio Kotzalidis, et al. **Posttraumatic Stress Disorder In Patients After Severe COVID-19 Infection**, JAMA Psychiatry (February 18, 2021)  Another study, which surveyed 5,186 people who had recovered from COVID-19, revealed that 33% (1,710 participants) had "anxiety or depressive symptoms," 29.6% (1,536 participants) "reported symptoms of disorders stemming from coronavirus-related trauma," and 11.9% (618 participants) indicated that "they had seriously considered suicide." [Mark Czeisler, Rashon Lane, Joshua Wiley, et al., **Follow-Up Survey Of US Adults Reports Of Mental Health, Substance Use, and Suicidal Ideation During The COVID-19 Pandemic**, JAMA (February 19, 2021)]

28.    More severe long-term COVID symptoms include lung-related issues, which cause "severe weakness and exhaustion," [CDC, supra note 19] and lasting kidney damage, which can lead to the need for dialysis. [Chung, Morrow, Birgham, et al., supra note 15]  Additionally, COVID-19 can leave many people with heart problems: one study showed that 60% of people who recovered from COVID-19 had signs of ongoing heart inflammation, which can lead to the common symptoms of shortness of breath, palpitations and rapid heartbeat.  This inflammation appeared even for those who had had mild cases of COVID-19 and who had no medical issues before they got sick. [Valentina O. Puntmann; M. Ludovica Carerj; Imke Wieters, et al. **Outcomes of Cardiovascular Magnetic Resonance Imaging In Patients Recently Recovered From Coronavirus Disease 2019**, JAMA (July 27, 2020)]  In addition to the above, according to the Mayo Clinic and others, long-term consequences of COVID-19 infection are thought to include neurologic disorders such as dementia, strokes, seizures, Parkinsonism, cognitive problems, and more.

10

29.    In December 2020, the U.S. Food and Drug Administration (FDA) issued Emergency Use Authorizations (EUAs) for COVID-19 vaccines developed by Pfizer-BioNTech and Moderna, and subsequently approved a Johnson & Johnson vaccine as well. [Press Release, U.S. Food & Drug Administration, FDA Approves First COVID-19 Vaccine (August 23, 2021); FDA Takes Additional Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for Second COVID-19 Vaccine (December 18, 2020)]

30.    Vaccines have proven effective against the spread of COVID-19. [CDC, **COVID-19 Key Things To Know** (last accessed August 3, 2022)  However, even fully vaccinated people can contract COVID-19 and spread the virus. [Lindsey Tanner, Mike Stobbe, and Philip Marcelo, **Study: Vaccinated People Can Carry As Much Virus As Others,** Associated Press (July 30, 2021)]  When vaccinated people do contract COVID-19 they can experience COVID-19 symptoms and may require hospitalization. [Deidre McPhillips & Christina Maxouris, **About 99.999% Of Fully Vaccinated Americans Have Not Had A Deadly COVID-19 Breakthrough Case, CDC Data Shows,** CNN Health (August 2, 2021)]  Moreover, fully vaccinated people who contract COVID-19 can also experience long-term COVID-19.  One study of breakthrough COVID-19 infections in 39 of 1,497 fully vaccinated Israeli healthcare workers, demonstrated that 19% of breakthrough cases experienced long-haul symptoms. [Moriah Bergwerk, Tal Gonen, Yaniv Lustig, et al., **COVID-19 Breakthrough Infections In Vaccinated Health Care Workers,** The New Eng. J. Med (July 28, 2021)]

31.    Given the possibility of COVID-19 infection, even among the fully vaccinated, experts emphasize that other preventive measures such as social distancing (i.e., physically isolating oneself from any other person at a minimum of six feet) and masking remain essential. [Lauren Mascarenhas, **Masks, Social Distancing Still Important Even With COVID-19 Vaccinations,**

11

Study Suggests, ABC (June 1, 2021)]

## II. INCARCERATED PEOPLE ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC

32.    The incarcerated population is especially vulnerable to becoming seriously ill or dying from COVID-19. [Kevin Schnepel, **COVID-19 In U.S. State And Federal Prisons**, Council on Criminal Justice (December 2020)]  One study found that the COVID-19 infection rate among those in federal and state prisons has been three times higher, and the mortality rate twice as high, than for those outside prison. [Id.]  This reality reflects what the CDC has called "[a] growing body of evidence indicat[ing] that COVID-19 transmission is facilitated in confined settings," with "high transmissibility of COVID-19 in enclosed spaces." [Kenji Mizumoto & Gerado Chowell, **Estimating Risk For Death From Coronavirus Disease, China,** Emerging Infectious Diseases (June 2020)]

33.    Indeed, prisons become "ticking time bombs" in a pandemic, as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases." [St. Louis Univ., **'Ticking Time Bomb': Prisons Unprepared For Flu Pandemic,** Science Daily (2006)]  Epidemiological research overwhelmingly "shows that mass incarceration raises contagion rates for infectious disease, both for people in jails, and for the community at large." [Sandhya Kajeepeta and Seth J. Prins, **Why Coronavirus In Jails Should Concern All Of Us,** The Appeal (March 24, 2020)]

34.    This heightened danger of transmission, serious illness, and death reflects two basic realities.  First, as the Chief Medical Officer at Rikers Island in New York City candidly acknowledged, individuals in carceral settings "cannot socially distance" while "living in a dorm, sharing a

12

bathroom." [Katie Shepherd, **'Trapped On Rikers': Jails And Prisons Face Coronavirus Catastrophe**, The Washington Post (March 23, 2020)]  Second, the risk presented by crowded and confined facilities is compounded by the almost continuous foot traffic of individuals from in and out of individual facilities. [Gregory Hooks and Wendy Sawyer, **Mass Incarceration, COVID-19, And Community Spread**, Prison Policy Initiative (December 2020)]  That is, the virus can easily enter prisons through daily staff movements, visitors, transfers of incarcerated people from other prisons, and outside contact through court hearings and off-site medical appointments.  Accordingly, prisons are a hotbed for COVID-19 transmission.  Any of the revolving door of prison staff can be asymptomatically carrying and transmitting COVID-19. [See Linda So & Grant Smith, **In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive For Coronavirus - 96% Without Symptoms**, Reuters (April 25, 2020)]

**A. THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC**

35.    From the very beginning, it was clear that prisons would be epicenters for transmission of COVID-19.  Approximately one month into the pandemic in the province of Hubei, China, over half of the newly reported COVID-19 cases were from jails. [Zi Yang, **Cracks In The System: COVID-19 In Chinese Prisons**, The Diplomat (March 9, 2020)]  Further, in mid-March 2020, the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case.  By March 30, 167 detainees, 114 correction staff, and 20 health workers at Rikers tested positive for COVID-19; two correction staff members had died and multiple detainees had been hospitalized. [Jan Ransom & Alan Feuer, **'We're Left For Dead': Fears Of Virus Catastophe At Rikers Jail**, N.Y. Times (March 30, 2020)]

13

36.   An equally gruesome pattern devastated the federal prison system. At the end of March 2020, FCI Lompoc, located in California, reported no active COVID-19 cases.  And yet, by April 16, 2020, it reported 69 positive cases among prisoners and 25 among prison staff. [See Richard Winton, **Coronavirus Outbreak At Lompoc Prison Is The Worst In The Nation: 69 Inmates, 25 Staff Infected**, L.A. Times (April 16, 2020)]  And by May 7, 2020, BOP reported that 599 prisoners at FCI Lompoc had tested positive for COVID-19. [Id.]  Similarly, on March 30, 2020, BOP reported two active COVID-19 cases among prisoners at FCI Elkton, a BOP facility in Ohio. [Stan Boney, **Union President Wants Change After 2 Elkton Prison Inmates Test Positive For COVID-19**, WKBN (March 30, 2020)]  By May 14, 2020, 169 prisoners had tested positive for the virus. [See United States v. Brooks, 07-CR-20047-JES-DGB, 2020 WL 2509107, at *2 (C.D. Ill. May 15, 2020)] and by July 21, 2020, 1,000 prisoners detained in FCI Elkton had contracted COVID-19. [See Deanne Johnson, **Prison Still Yields Largest Share Of COVID-19 Cases**, Morning Journal (July 21, 2020)] For these reasons, from the early days of the pandemic, medical and public health experts urged emergency action to fight the spread of COVID-19 in carceral settings, including decarceration, improved access to medical care, compliance with CDC guidelines, and more. [See, e.g., Brad Lander, **Doctors In NYC Hospitals, Jails, And Shelters Call On The City To Take More Aggressive Action To Combat The Spread Of Coronavirus**, Medium (March 12, 2020)]

37.   Indeed, as COVID-19 began to spread across the United States, correctional officials around the country agreed that particular care was required to stop the spread of COVID-19 within the nation's prisons. [See, e.g., Brie Williams & Leann Bertsch, **A Public Health Doctor And Head Of Corrections Agree: We Must Immediately Release People From Jails And Prisons**, The Appeal (March 27, 2020)]  For example, Leann Bertsch, the Director of the

14

North Dakota Department of Corrections and Rehabilitation, concluded that "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all," and that "putting public health first is the best, and only, way to effectively achieve [a department of corrections'] public safety mission during the COVID-19 pandemic." [Williams and Bertsch, supra, note 48]

38.    In recognition of the ongoing public health crisis, the CDC issued guidance in an effort to at least slow the spread of COVID-19 within detention facilities. [CDC, **Interim Guidance On Management Of Coronavirus Disease 2019 (COVID-19) In Correctional And Detention Facilities** (Published March 23, 2020, updated June 9, 2021)] Other organizations, including public health agencies, academic institutions, and advocacy groups published similar protocols. [See e.g., NYC Health, **Coronavirus Disease 2019 (COVID-19) Guidance For Correctional Facilities**, NYC (March 19, 2020)] These publications provided comprehensive guidance for personal hygiene, cleaning, social distancing, symptom response, and the use of medical isolation and quarantine, among others.    Specifically, the CDC recommended, inter alia, that correctional facilities:

- "Clean and disinfect surfaces and objects that are frequently touched, especially in common areas," including, e.g., doorknobs, recreation equipment, telephones, and computer equipment "several times per day";

- "Ensure adequate supplies to support intensified cleaning and disinfection practices," including by providing cleaning supplies to inmates for disinfection in their cells;

- "Provide masks at no cost to incarcerated / detained individuals and launder them routinely";

- "Implement social distancing strategies to increase the physical space between incarcerated / detained individuals" to the extent possible, including in "common areas," "recreation," "meals," "group activities," "housing," "work details," and "medical." This includes utilizing not only physical distancing but also alternate scheduling practices to minimize the number of individuals in any place at one time;

15

- "Limit transfers of incarcerated / detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation";

- Perform "pre-intake symptoms screening and temperature checks for all new entrants," whether inmate or staff;

- Implement "randomizing testing of asymptomatic staff without known COVID-19 exposure for early identification";

- "Provide" and "ensure that staff wear adequate protective equipment";

- "Restrict non-essential vendors, volunteers, and tours from entering the facility";

- Conduct "vigilant symptoms screening", which includes testing "symptomatic and asymptomatic" individuals for COVID-19 because many individuals infected with [COVID-19] do not display symptoms";

- For any individual who either reports symptoms or has come into close contact with an infected individual, "administer quarantine and monitoring for at least 14 days";

- For any individual suspected or confirmed positive for COVID-19, "notify public health authorities," "administer or request any necessary medical care", and perform "contact tracing";

- Ensure that quarantined individuals receive adequate time out of cell and stimulation so that quarantine housing does not resemble conditions of administrative segregation, or "solitary confinement," so as not to deter reporting of symptoms;

- Separate those with confirmed COVID-19 from those with suspected COVID-19 in distinct quarantine areas;

- Retest individuals in quarantine periodically, and discontinue quarantine only after individual has surpassed specific number of days without symptoms or fever - for those not autoimmune compromised, 10 days without symptoms, and 24 hours without fever; for autoimmune compromised, 20 days and 24 hours.

[**Isolation**, University of California San Francisco (2020), https://amend.us/covid-19-in-correctional-facilities-medical-isolation/]

39.    To be clear, however, the CDC's guidance was not an exhaustive catalogue of what was medically required to protect people's lives during a pandemic.    Nor was it a repudiation of the CDC's scientific guidance that social distancing is required to stop the transmission of the virus.

40.    According to the World Health Organization ("WHO"), prisoners "should have access to testing as soon as they present symptoms." And in order to prevent COVID-19 outbreaks, all prisoners "suspected or confirmed" to have [COVID-19] should be given "access to health care, including urgent, specialized care, without undue delay," in particular for respiratory isolation and treatment. [Inter-Agency Standing Committee, WHO and OHCHR, Interim Guidance. **COVID-19: Focus On Persons Deprived Of Their Liberty**, at 4 (March 2020)]

41.    As well, in response to the need for immediate action, jails and prisons released inmates in order to prevent community outbreaks of severe illness and death from COVID-19.  For example, in March 2020 New Jersey released 1,000 people, [Tracey Tully, **1,000 Inmates Will Be Released From N.J. Jails To Curb Coronavirus Risk**, N.Y. Times (March 23, 2020)] and after identifying the need to further reduce prison populations, New Jersey released 2,258 prisoners on November 11, 2020. [Tracey Tully, **2,258 N.J Prisoners Will Be Released In A Single Day**, N.Y. Times (November 4, 2020)]  Los Angeles County, California released more than 3,500 people in April 2020, [CBS Los Angeles, **Los Angeles, Ventura County Jails Releasing Inmates To Cut Risk Of Coronavirus Exposure** (April 15, 2020)] and in May 2020 Cuyahoga County, Ohio released more than 900 people. [Ronnie Dahl, **Will Reduced Crowding At Cuyahoga County Jail Continue After The Coronavirus Crisis?**, 19 News (April 23, 2020)]

42.    Moreover, courts across the country recognized "that [COVID-19] could promptly and critically threaten" lives and accordingly ordered the release of prisoners. [United States v. Perdigao, CR 07-103, 2020 WL 1672322, at *1 (E.D. La. Apr. 2, 2020)]  Indeed, numerous courts released prisoners detained at Fort Dix as a result of COVID-19. See United States v. Avery, 2020

WL 6728781, at *1 (S.D.N.Y. Nov. 16, 2020); United States v. Fernandez, 2020 WL 7647459, at *3 (S.D.N.Y. Oct. 14, 2020); United States v. Vega, 2020 WL 7060153, at *3 (E.D.N.Y. Dec. 2, 2020); United States v. Staats, 2020 WL 6888224, at *2 (E.D. Pa. Nov. 24, 2020).

43.    States and other local jurisdictions likewise made changes to carceral policies in response to the COVID-19 pandemic, including eliminating medical co-pays for incarcerated people. [Warren, Pressley, Haaland Lead Bicameral Group of Lawmakers Requesting Information on Medical Copays in Prisons and Their Impact on the Spread of COVID-19, Elizabeth Warren, Senator for Massachusetts (November 19, 2020)]   Others required facilities to distribute and make available sanitation supplies and hand sanitizers, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who entered prisons. [See, e.g., Indiana Dep't of Corr., **Preparedness and Response Plan (Adult and Juvenile)** 5-8 (2020)] And several jurisdictions suspended visits from family members and lawyers. [The Marshall Project Starf, **How Prisons In Each State Are Restricting Visits Due To Coronavirus**, The Marshall Project (March 17, 2020)]

III.   THE EFFORTS OF THE BUREAU OF PRISONS AND
       ITS AGENTS WERE INADEQUATE

44.    At all relevant times, Defendants and their agents failed to respond effectively to the COVID-19 pandemic.  They failed to anticipate and prepare for the magnitude of the threat posed by COVID-19 to its own staff and the people BOP detains; failed to respond in any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including and especially Fort Dix; and continued to fail to implement even the baseline measures that would assure the safety of BOP's own staff, of Plaintiff, and of others incarcerated within Fort Dix, and of the communities

18

into which staff and others travel on a daily basis. Defendants' primary failure was their unwillingness to implement social distancing measures, despite clear public health guidance that it was and is necessary to prevent COVID-19 infection.

45.    In fact, Defendants' preparations were inadequate from the very beginning. Initial guidance from Defendant Carvajal was not issued until March 9, 2020, at which point it addressed only the possibility of telework for some employees at an agency where the vast majority of employees must be physically at facilities to do their jobs, and it mentioned restrictions only for people who had traveled to already-impacted countries. [See Fed. Bureau of Prisons, **BOP Memorandum** (March 9, 2020)

46.    Moreover, as late as March 26, 2020 - weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel, and ordered people to shelter in place - Defendant Carvajal announced that BOP had merely taken an inventory of soap, but had not distributed. [Fed. Bureau of Prisons, **Statement From BOP Director** (March 26, 2020)]

47.    Given Defendant Carvajal's failure to take action to prepare for or confront the threat of COVID-19, BOP faced criticism for endangering its employees, as well as the prisoner population. [See Senators Elizabeth Warren & Cory Booker, et al., Letter to Bureau of Prisons (March 9, 2020)] Press accounts highlighted the impending storm. [See, e.g., Michael Balasamo & Michael R. Sisak, **Federal Prisons Struggle To Combat Growing COVID-19 Fears**, Associated Press (March 27, 2020)]

48.    Among other failures that contributed to the spread of COVID-19 at BOP facilities, officers reported that, for example, they were initially given only gloves - not masks, face shields, or other PPE - when interacting with

19

prisoners sick enough to require transport to the hospital. [See Joseph Neff & Keri Blakinger, **Federal Prisons Agency "Put Staff In Harm's Way" Of Coronavirus: Orders At Oakdale In Louisiana Help Explain COVID-19 Spread,** The Marshall Project (April 1, 2020)] Those same officers were ordered back to the job, contrary to CDC guidance that called for self-isolation of correctional staff who had been exposed to COVID-19. [Id.]

49.    Moreover, Defendants and their agents did not begin distributing masks to prisoners until April 2, 2020, nearly a month after Former Presidnet Trump declared a state of national emergency in response to the COVID-19 pandemic. [See Harry August & Alex Garnick, **'The Situation Here is Dire': How An Upstate New York Prison Failed To Contain A COVID-19 Outbreak,** The Appeal (April 16, 2020) And despite knowing for months that masks were vital to prevent the spread of COVID-19, in August 2020 federal prisoners reported that they were given "non-reusable masks" and required to use those masks for upwards of four months. [Kim Bellware, **Prisoners And Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'** N.Y. Times (August 24 2020)]

50.    Across facilities, Defendant Carvajal scrambled to address staffing and resource needs.  Despite this, BOP continued to limit the number of contractors who supplied PPE and failed to secure COVID-19 testing kits.  In fact, the agency was sued by its own staff members for requiring them to work in hazardous conditions. [Luke Barr, **Federal Prisons Facing Shortages Of Resources Amid Coronavirus Outbreak,** ABC News (April 1, 2020)]

51.    Working conditions within BOP facilities were so dire that BOP employees - including corrections officers - filed a complaint with the Occupations Safety and Health Administration ("OSHA") alleging unsafe

20

conditions at numerous federal prisons, including Fort Dix. Among other things, the officers' OSHA complaint pointed to BOP having "directed staff throughout the Bureau of Prisons who have come in contact with, or been in close proximity to individuals who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complained of BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidelines, or to provide sufficient PPE. [See Notice of Alleged Safety or Health Hazards (March 31, 2020)]

52. In response, BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19." [See Fed. Bureau of Prisons, **Correcting Myths And Misinformation About BOP And COVID-19**, (April 11, 2020) Attempting to rebut the assertions that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, BOP simply required them to work, but with masks on. [Id. at 3] Due to BOP's actions, during the pandemic 13,375 BOP employees have been sickened with COVID-19. [See Fed. Bureau of Prisons, **COVID-19 Cases** website (last accessed August 6, 2022)]

55. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, signed into law on March 27, 2020, made funding available for federal prisons to purchase PPE and test kits for COVID-19 and authorized the Department of Justice to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic. [CARES Act, Pub. L. NO. 116-136 § 12003(b), 134 Stat. 281 (2020)] Pursuant to that authority, then Attorney General William Barr made a finding that emergency conditions were materially affecting the functioning of BOP, and on April 3, 2020 directed Defendant

Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement; at that time, Barr admitted that BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners had "not been perfectly successful at all institutions." [Memorandum from Attorney General Barr to Director Carvajal (April 3, 2020)]

54.    On April 22, 2020, BOP issued a memo purporting to interpret then Attorney General Barr's guidance, but instead substantially limited the number and types of people who might qualify for home confinement under the Attorney General's memo. [Memorandum from Correctional Programs Division Acting Assistant Director Andrew Matevousian & Reentry Services Division Assistant Director Hugh J. Hurwitz to Chief Executive Officers (April 22, 2020)] Despite Attorney General Barr's guidance, i.e. to "immediately maximize appropriate transfers to home confinement." [Memorandum from Attorney General Barr, supra, note 76]

55.    Indeed, Defendant Carvajal's April 22, 2020 guidance gave wardens virtually unchecked discretion to deny a request for release and imposed unnecessary and impractical barriers on prisoners seeking release. For example, pursuant to BOP's guidance, to be released prisoners could have no disciplinary infraction of any kind for 12 months, had to provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, for those with any on-going medical care, were required to show that their medical needs could be met outside the prison, and that they had a 90-day supply of prescribed medications. [Id.]

56.    Rather than proactively addressing the conditions that place people in BOP custody at risk of illness or death, Defendant Carvajal focused on spending money purchasing hydroxycloroquine, an unproven remedy that medical

authorities did not believe could effectively treat COVID-19. [Lachlan Markay, **The Bureau Of Prisons Just Bought A Ton Of Hyroxychloroquine, Trump's COVID-19 Miracle Drug**, The Daily Beast (April 7, 2020)]

57. During the first three months of the pandemic, Defendant Carvajal "rejected or ignored more than 98 percent of the compassionate release requests," including many from medically vulnerable prisoners. [Keri Blakinger & Joseph Neff, **31,000 Prisoners Sought Compassionate Release During COVID-19, The Bureau Of Prisons Approved 36**, The Marshall Project (June 11, 2021)] From March 2020 to May 2020, "wardens approved 1.4% of release applications," but "central office rejected most of those, with [Defendant Carvajal] ultimately approving just 0.1%. [Id.]

58. Subsequent BOP data "shows officials approved fewer" compassionate release applications "during the [first year of the] pandemic than they did the year before." [Id.] "The downturn in approvals came even as the number of people seeking compassionate release skyrocketed...." [Id.] From March 2020 to April 2021, 31,000 federal prisoners sought compassionate release but Defendant Carvajal approved only 36 requests." [Id.] "By comparison, federal judges approved 21% of compassionate release requests they considered in 2020." [Id.]

59. The consequences of Defendant Carvajal's failure to employ any of the preventive measures that would have protected prisoners from COVID-19 have been dramatic. Nationwide nearly 50,000 prisoners in BOP custody tested positive for the virus. That is, two out of every seven prisoners within the care and custody of BOP contracted COVID-19. [The Marshall Project, **A State-By-State Look At 15 Months Of Coronavirus In Prisons** (July 1, 2021)]

23

60.   Federal facilities all over the country were overrun with the virus, including but certainly not limited to:

a. FCI Elkton: 598 prisoners currently detained in the facility have recovered from COVID-19, with 8 deaths;

b. FCI Fort Dix: 1,434 prisoners currently detained in the facility have recovered from COVID-19, with 2 deaths;

c. Texarkana FCI: 732 prisoners currently detained in the facility have recovered from COVID-19, with 2 deaths;

d. Marion U.S.P.: 708 prisoners currently detained in the facility have recovered from COVID-19, with 2 deaths;

e. FCI Seagoville: 1,027 prisoners currently detained in the facility have recovered from COVID-19, with 8 deaths;

f. Florence FCI: 641 prisoners currently detained in the facility have recovered from COVID-19, with 3 deaths;

g. Leavenworth U.S.P.: 593 prisoners currently detained in the facility have recovered from COVID-19, with 4 deaths;

h. Beaumont Low FCI: 808 prisoners currently detained in the facility have recovered from COVID-19, with 4 deaths;

i. Big Spring FCI: 645 prisoners currently detained in the facility have recovered from COVID-19, with 3 deaths;

[See Fed. Bureau of Prisons, **COVID-19 Cases** (last accessed August 5, 2022)]

61.   As startling as these figures are, they are most certainly an undercount. Indeed, BOP has repeatedly understated the scope of the problem and refused to take steps to accurately assess the situation or provide information about it. For example, on April 6, 2020, BOP reported that only eight prisoners in FCI Elkton had tested positive for the virus. However, on that same day, press accounts reported that medical capacity had fallen to 50% within the prison and that three prisoners had already died from the virus. [**Ohio Gov. Mike DeWine Authorized Ohio National Guard To Assist Elkton Prison,** WKYC (April 6, 2020)] And as of January 14, 2022, BOP reported that of the

1,614 COVID-19 tests conducted at FCI Elkton only 519 have come back positive, which stands in stark contrast to the nearly 1,000 confirmed positive cases that BOP previously reported. [See United States v. Babbitt, 496 F. Supp. 3d 903, 912 (E.D. Pa. 2020)]

62. Further, BOP's website has consistently understated the impact of COVID-19. BOP has "a policy of removing cases and deaths from its" public reporting, [The Marshall Project, supra, note 87] which explains why from March 2021 to November 2021, the number of inmates who contracted COVID-19 while in BOP custody decreased from 46,986 to 42,670 - an illogical trend for a number that presumably can only increase over time. [See Fed. Bureau of Prisons, supra, note 88; see also Joshua Manson and Liz Dewolf, **The Federal Bureau Of Prisons Is Even Less Transparent Than We'd Thought**, UCLA LAW Behind Bars Data Project (April 2, 2021)]

63 Moreover, BOP's online COVID-19 information dashboard only contains data among prisoners who are "currently incarcerated." [Manson and Dewolf, supra, note 92] Thus, if a prisoner tests positive for COVID-19 and is subsequently released from BOP custody, BOP subtracts that prisoner's positive test from the total number of confirmed COVID-19 cases because he is no longer incarcerated. One report found that "dozens of BOP facilities have removed [COVID-19] cases from their total counts almost every day since at least as far back as October 2020." [Id.]

64. Similarly unreliable is BOP's facility-specific data. While BOP claims to maintain data for individuals who are currently incarcerated - a disturbing practice that obscures the true toll of COVID-19 in federal prisons - the facility-specific data does not include reliable counts. For example, on January 14, 2022, BOP reported that there were 923 prisoners currently

25

incarcerated at Beaumont Low FCI who had recovered from COVID-19, but at the same time that there had only been 660 detected infections at the facility. [See Fed. Bureau of Prisons, supra, note 88]  BOP ignored inquiries into this data discrepancy and "[i]t is therefore, unclear whether BOP adjusts total cases when transferring people who have been infected between its facilities, and whether it treats all variables similarly with respect to those who are infected and then released." [Manson and Dewolf, supra, note 92]  What is clear, however, is that BOP's data significantly undercounts the toll that COVID-19 has had within its facilities.

65.  Even in the midst of the virus's first rapid spread across the country, Defendant Carvajal persisted in transferring prisoners between prisons.  In their OSHA complaint, BOP employees reported that BOP "authorized movement of infected inmates, inmates suspected of being infected, [and] inmates who [had] been in close contact or proximity to infected inmates, to areas of the country that [did] not have any rate of infection, or to facilitate that otherwise [had] not shown signs of any introduction of the virus, thus introducing the virus into [] uninfected area[s]." [OSHA complaint, supra, note 71]

66.  As the pandemic ravaged through BOP facilities, Defendants continued to flout CDC guidelines.  Defendant Carvajal allegedly "ordered a halt of prisoner movement on March 13, but there is evidence that [prisoners] were still being shipped around the country well into April." [Keri Blakinger & Keegan Hamilton, **"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps,** The Marshall Project (June 18, 2020)]  And despite the rapid increase in COVID-19 cases within BOP facilities, BOP "resumed transfers in late May" 2020. [Id.]  BOP guidance said that prisoners were

26

supposed to be tested and strictly quarantined during transfers, but according to prison union officials BOP ignored that guidance and shoved "Tylenol and Motrin in [prisoners] so they [didn't] have a fever," and then put "them on a plane." [Id.]

67.   Even after prisoner transfers were linked to numerous COVID-19 outbreaks in both State and Federal prisons, Defendants and their agents continued to transfer prisoners between federal facilities. [See Cary Aspinwall and Ed White, **Moving People - And Coronavirus - From Prison To Prison**, The Marshall Project (December 21, 2020)]   According to a federal corrections officers, well into 2021, Defendants and their agents were still transferring prisoners between federal prisons who were not "adequately screen[ed] or quarantined" prior to or after the transfer, which resulted in a COVID-19 outbreak at the intake facility. [Joshua Ceballos, **Prison Staff Warn Of Potential COVID-19 Outbreak In Miami Detention Center**, Miami New Times (July 29, 2021)

68.   Defendant Carvajal "did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate." [United States v. Brown, CR 13-176-1, 2020 WL 5801494, at *3 (E.D. Pa. Sept. 29, 2020)]

69.   The consequences of the Defendant Carvajal's failure to heed guidance was deadly.   As of August 5, 2022, at least 302 federal prisoners have died from COVID-19, and 7 staff members. [Fed. Bureau of Prisons, supra, note 88 (as of August 5, 2022)]   While this number is startling, it is worth noting that it too is most certainly an undercount.   The number of deaths within BOP facilities does not include individuals who contracted COVID-19

27

while in BOP custody and were subsequently released; thus, the true death toll is likely much higher than BOP reports. [See Maura Turcotte, Rachel Sherman, Rebecca Griesbach and Ann Hinga Klein, **The Real Toll From Prison COVID Cases May Be Higher Than Reported**, N.Y. Times (July 30, 2021)]

## IV.   DEFENDANTS WERE AWARE THAT SOCIAL DISTANCING WOULD BE DIFFICULT AT FORT DIX

70.   On April 11, 2020, just days after BOP reported that the first prisoner at Fort Dix had tested positive for COVID-19, Defendant Ortiz warned prisoners at Fort Dix that "social distancing is not possible in this environment."

71.   Perversely, the design of Fort Dix means that, while those confined there are designated by BOP as among the least dangerous prisoners, its exact design exposed them to a heightened risk of contracting COVID-19. [BOP institutions are operated at five different security levels: minimum, low, medium, high, and complex. Fed. Bureau of Prisons, **About Our Facilities** (September 12, 2006)]

72.   Except for disciplinary and medical isolation, Fort Dix has no separate one-person housing cells. [PREA Audit: Auditor's Summary Report (May 31, 2014)]

73.   People confined at Fort Dix are housed together in group quarters. Those at the Camp are divided into two communal dorms, referred to as A-wing or (A-unit) and B-wing (or B-unit).  Each wing typically houses approximately 150 people in a grid of bunk beds two or three feet apart. [Declaration of Michael Scronic, Wragg v. Ortiz, Case No. 1:20-cv-05496 (D.N.J. May 4, 2020), ECF No. 1 at ¶ 4] Inmates in the bunks are so close that they can reach out and touch those in the bunks on both sides; in some places, the bunks are

28

arranged three-deep - that is, inmates sleep not only with bunks to their left and right, but also at their head and feet. [Id.]

74.   The main facility is divided into East and West Compounds, with approximately five buildings on each side that can house more than 300 people each.   The buildings are threer stories high and consist mostly of 12-person rooms, with a smaller number of two-person rooms.   The 12-person rooms can be as small as 500 square feet.   Within that space are six two-person bunk beds, 12 lockers, and a card table.   Prisoners maintain free movement within their building, sharing common TV rooms, computers, telephones, and bathrooms.

75.   The bathrooms at Fort Dix are communal.   In both the main facility and the Camp, prisoners share a limited number of sinks, showers, and toilets with dozens of other prisoners within just a few feet.   In the Camp, for example, a single bathroom with shared sinks and toilets is used by some 150 people. [Id.]

76.   Because the prisoners at Fort Dix have nowhere else to go, many have spent the pandemic under their covers, quite literally hiding from the virus.   Even then, most are still within arm's reach of other people in the bunk above or below them, and the beds to the left and right.   Thus, the impossibility of social distancing is not just a warden's warning; it is a fact.

77.   The fundamental structure of the low and minimum security Fort Dix facility makes it a COVID-19 deathrap.   It is not possible for people to engage in social distancing or self-quarantine precautions as recommended by the CDC.   As Dr. Joe Goldenson, the former Director of the Jail Health Services of the San Francisco Department of Public Health, explains, Fort Dix's communal set-up makes the social distancing essential to preventing the

29

spread of infection "impossible." [Declaration of Dr. Joe Goldenson, Wragg v. Ortiz, Case No. 1:20-cv-05496 (D.N.J. May 4, 2020), ECF No. 1 at ¶ 36.

## V.   DEFENDANTS FAILED TO TAKE PROPER PRECAUTIONS

78.   Defendants' and their agents' actions to protect prisoners from COVID-19 were wholly inadequate. Although BOP purported to impose a nationwide quarantine on April 1, 2020, Defendants Ortiz and Kodger failed, in fact, to impose effective quarantine measures. For example, Defendants Ortiz and Kodger did not distribute masks to prisoners until early April, and not all prisoners received masks at that time. Correctional officers, who live throughout the central New Jersey and greater Philadelphia area, continued to move in and out of Fort Dix each day without sufficient medical screening or protective equipment. They moved between the Camp and main facility during the pandemic, spreading the virus between various areas of the prison. And prisoners continued to move between wings of the Camp and within buildings in the main facility. Indeed, prisoners report that from the very beginning, Defendants Ortiz and Kodger moved prisoners between units without testing them for COVID-19. In sum, there was no quarantine whatsoever.

79.   BOP reported the first confirmed COVID-19 case at Fort Dix, an infected staff member, on March 30, 2020.

80.   That same day, Defendant Ortiz sent a notice prohibiting prisoners from "enter[ing] the kitchen on either the East or West compounds for meals with their faces concealed with makeshift masks due to COVID-19 concerns." [Scronic Decl., supra, note 107 at ¶ 8] For a week following this, staff told prisoners that they could not wear masks that were not issued by the prison. [Id.]

30

81. On April 7, 2020, BOP reported Fort Dix's first COVID-positive prisoner on its website. On April 9, it reported its second case. That same day, a memorandum from the facility's medical staff announced that "a second [C]amp offender has been determined to be positive for COVID-19 and a third Camper has been isolated for evaluation of symptoms and is awaiting COVID-19 test results.... [I]t is strongly recommended that you [wear] your surgical mask upon issue." [Id. at ¶ 10]

82. By April 11, 2020, BOP reported that four prisoners at Fort Dix had contracted the virus and Defendant Ortiz told prisoners: "In order to maintain the health of staff and inmates, the following is expected from all inmates: wear your surgical masks! Since social distancing is not possible in this environment, masks will help keep you and others from spreading viruses." [Id. at ¶ 11]

83. From April 2020 to March 2021, Fort Dix prisoners received approximately seven face masks, two disposable surgical masks, and four to five cloth masks, and prisoners were not given additional soap to wash their masks so they had to use their personal allotment of soap to ensure that their masks were cleaned.

84. Defendant Ortiz and Kodger failed to enforce masks mandates or social distancing protocols. Thus, prison staff routinely failed to wear masks or other protective equipment and forced prisoners to disregard social distancing guidelines by making them line up to get meals. Indeed, it appears that staff only enforced COVID-19 protocols when lawmakers and federal auditors came to visit the prison.

31

35.    Defendant Ortiz, N'Diaye, and Kodger never instituted a policy to test prison staff or guards for the virus; thus, those who came into contact with COVID-19 positive people have been able to spread the virus. In fact, in November 2020, as COVID-19 devastated the prison population at Fort Dix, Defendant Carvajal "refused to provide on-site testing to staff at any federal prison," including Fort Dix. Even prison staff spoke publicly about the last of testing at Fort Dix, saying that Fort Dix likely "never wanted to test staff" because they were "concerned about how the heck they would run [Fort Dix]." [Keegan Hamilton, **Federal Prisons Keep Turning Into COVID Nightmares: 'Everyone Looks Like Death,'** Vice News (November 12, 2020)]

86.    From March to October 2020, Defendants never tested the prisoner population as a whole. Further, Fort Dix's Health Services refused even to test prisoners who complained of COVID-19 and instead typically instructed them to just go and rest.

87.    Indeed, at all times relevant to this Complaint, Defendants did not have a policy to test all prisoners, even those who came into contact with COVID-19 positive staff or prisoners.

88.    Fort Dix's Health Services also ceased temperature checks of incoming prison staff without explanation in June 2020, and stopped checking prisoner temperatures at around that same time.

89.    When it became known that the Plaintiff's unit (5812) was exposed to the Coronavirus, the entire unit was tested. This occurred on October 20, 2020. The tests were sent to an outside laboratory where a standard, non-rapid test was performed. When the tests came back five days later, 54 inmates tested positive and were removed from the unit (Plaintiff Lackner's cellmate being one of them). However, the fresh test results no longer

reflected the current true COVID state in the unit, since in the interum five days those 54 inmates were continuing to infect other people. At this point, instead of retesting the unit with the rapid-test machine - which the BOP had on location, and further separating out COVID-positive people, officials did the worst possible thing: They condensed the COVID-negative inmates with an unknown number of newly positive cases, by forcibly evicting the entire third floor and relocating them over the remaining first two floors. This severely constricted the interpersonal space of each inmate, and was done in order to move the 54 infected inmates back into the housing unit to occupy the vacated third floor, whereupon they were locked in. In a letter dated October 22, 2020, while still awaiting the COVID test results for the unit, Defendant Ortiz admits to being "... concerned that bed space for isolation and exposure quarantine will be inadequate." (See Exhibit A) On belief, prison officials' solution to this problem was the decision to effectively condemn the remaining approximately 173 COVID-negative prisoners to infection, thereby making room for other inmates who were already sick. In Plaintiff Lackner's case, because his cellmate was sent to quarantine, Lackner went from having his own 2 man room where he could possibly have made it through the COVID wave unscathed, to a fully-occupied 12 man room with an occupancy rating of 9 by BOP standards, with no chance whatsoever to avert infection.

90. Further, Defendants Ortiz and Kodger deliberately placed COVID-19 negative prisoners in danger by forcing them into COVID-19 positive units. For example, on December 28, 2020, Joseph Alexander, a prisoner who had recently transferred into Fort Dix, was placed in a COVID-19 positive housing unit, unit 5812, despite testing negative for the virus a few days prior. Mr. Alexander was under the impression that he was being placed in a COVID-negative housing unit, however, when he arrived there were eight active COVID-

33

19 cases in his unit. When Mr. Alexander complained of his placement, he was told that his unit had achieved herd immunity and that he should not worry. ["Herd immunity occurs when a large portion of a community (the herd) becomes immune to a disease, making the spread of disease from person to person unlikely." The Mayo Clinic, **Herd Immunity And COVID-19 (Coronavirus): What You Need To Know** (August 28, 2021)]

91.   Additionally, Defendants Ortiz's, N'Diaye's, and Kodgers's failures to contain movement by prisoners and staff throughout otherwise separate areas of Fort Dix ensured that once an infected person arrived, he would not be confined to particular areas, and the result would be that the virus could and would spread to other areas, as in fact happened.

92.   On April 8, 2020, Defendants Ortiz and Kodger converted the B-wing of the Camp facility into a makeshift quarantine for 63 people who believed they were being considered for potential release on home confinement pursuant to the CARES Act. [CARES Act, Pub. L. NO. 116-136 § 12003(b), 134 Stat. 281 (2020)] Those 63 people were pulled from both A and B-wings. The remaining prisoners, approximately 160 people, were packed into the A-wing, but Fort Dix did not test any of them or attempt to limit mingling among groups of people who had previously been exposed to COVID-19. [Scronic Decl., supra, note 107 at ¶ 16]

93.   As a result of Defendants Ortiz's and Kodger's failure, by May 6, 2020, 40 prisoners at the Camp and three staff members had tested positive for the virus. [Colleen O'Dea, **COVID-19 Horror Stories Prompt ACLU-NJ To File For Temporary Release Of Medically Fragile Prisoners**, NJ Spotlight News (May 6, 2020)]

34

94.   This trend continued and resulted in nearly 2,000 prisoners at Fort Dix contracting COVID-19 by March 13, 2021. [Joe Atmonavage, **2 Inmates Begged For Release From Federal Prison In N.J. Where Coronavirus Raged. They Both Died Of COVID**, N.J.com (March 13, 2021)]

**A.   FCI Elkton Transfers**

95.   Defendants did not learn from the initial COVID-19 outbreak. Rather, they continued to ignore the relevant guidance and disregarded pertinent policies with impunity.

96.   From September 28, 2020 to October 30, 2020, Defendant Carvajal and English "transferred a large number of inmates from [FCI Elkton] known to be in the midst of a serious COVID-19 outbreak to Fort Dix without an effective plan in place to avoid spreading the virus from transferring inmates to staff and inmates at Fort Dix. [United States v. Newell, 1:13-CR-165-1, 2021 WL 3269650, at *2 (M.D.N.C. July 30, 2021)]  Indeed, in four waves - on September 28, October 6, 21 and 28 - Defendant Carvajal and English transferred 298 prisoners from FCI Elkton to Fort Dix. [Joe Atmonavage, **There Is 'No-Evidence' That Transferring Sick Inmates To N.J. Prison Led To COVID-19 Outbreak, Official Says**, NJ.com (November 11, 2020)]

97.   According to Defendant Kodger, the prisoners at FCI Elkton were brought to Fort Dix - a facility where social distancing was already impossible - "in order to increase the opportunities for inmates to practice social distancing" at FCI Elkton. [Declaration of Kimberly Kodger, United States v. Rodriguez, 16-CR-07 (AJN) (S.D.N.Y. Nov. 20, 2020) ECF No. 59 at ¶ 2]

98.   Defendant Kodger claimed that FCI Elkton transferees were tested upon arrival, quarantined in a private unit on the East Side of Fort Dix's

35

main compound, and never came into contact with any other prisoners. [Id. at ¶¶ 3-14] Defendant Kodger's claims were untrue. Indeed, COVID-negative prisoners from the FCI Elkton transfers were almost immediately mingled with the prisoner population.

99. Further, at the time of the FCI Elkton transfers "Fort Dix [did] not test staff," even those who came in contact with COVID-19 positive prisoners. [Id. at ¶ 8]

100. Following the FCI Elkton transfers, COVID-19 ravaged Fort Dix for nearly four months, infecting approximately 2,000 prisoners.

101. Specifically, on September 20, 2020, there were no reported cases of COVID-19 at FCI Fort Dix. [United States v. Tubbs, CR 2:14-00135-KD-N, 2020 WL 5733199, at *4 (S.D. Ala. Sept. 24, 2020), appeal dismissed sub nom. United States v. Van Tubbs, 20-13988-G, 2021 WL 1608747 (11th Cir. Apr. 16, 2021)]

102. On September 28, 2020, Defendants Carvajal and English transferred 64 prisoners from FCI Elkton to Fort Dix, six of whom tested positive for COVID-19 upon arrival at FCI Fort Dix. [Kodger Decl., supra, note 123 at ¶ 9] These active cases were not reported by BOP as present at either Elkton or Fort Dix.

103. On October 6, 2020, Defendants Carvajal and English transferred an additional 65 prisoners from FCI Elkton to Fort Dix, six of whom tested positive for COVID-19 upon arrival at Fort Dix. [Id. at ¶ 10] These active cases were also not reported by BOP as present at either of the two facilities.

104. On October 9, 2020, BOP publicly reported that there were no active COVID-19 cases at Fort Dix. [See Joe Atmonavage, **Lawmakers Have 'Grave**

**Concerns' Over How Officials Are Handling COVID-19 Outbreak At N.J. Prison,** NJ.com (November 9, 2020)]   However, on that same day, Fort Dix's Health Services sent a memorandum to the prison population advising them that prisoners "at FCI Fort Dix ... tested positive for COVID-19." [See Exhibit B: October 9, 2020 - Memorandum For Prison Population]

105.   On October 22, 2020, as a result of the increase in COVID-19 positive cases, Defendant Ortiz wrote to Defendant English, BOP director for Northeast Region, requesting a "temporary moratorium" on all transfers into Fort Dix through November 23, 2020.   In so doing, Defendant Ortiz stated that Fort Dix was "concerned that bed space for isolation and exposure quarantine [would] be inadequate." [Exhibit A: October 22, 2020 - Letter from Defendant Ortiz]

106.   On October 23, 2020, Defendant English sought a moratorium on all incoming transfers to Fort Dix from Defendant Carvajal and/or his agent. However, and despite the increase in COVID-19 cases, Defendant English requested that the moratorium not begin until October 29, 2020, a week after it was requested. [Exhibit C: October 23, 2020 - Letter from Defendant English]

107.   On information and belief, Defendant English refrained from seeking an immediate moratorium on transfers in order to complete the fourth FCI Elkton transfer as scheduled.

108.   On October 25, 2020, approximately 54 prisoners residing in housing unit 5812 were informed that they had contracted COVID-19.   These cases were not reported by BOP until October 29, the same day as the scheduled fourth and final transfer of FCI Elkton prisoners into Fort Dix.   The actions by

37

Defendants Ortiz and Kodger that followed ensured that the number of cases would rise quickly.

109. Specifically, Defendants Ortiz and Kodger forced prisoners, including COVID-19 negative and positive prisoners, to move between floors in their housing unit (5812), as a result of which prisoners who had previously tested negative for the virus were quickly infected and began testing positive shortly thereafter.

110. Prisoners who tested positive, many of whom were actively suffering from COVID-19 symptoms, were forced to to carry a bag of their belongings from unit 5812 to unit 5851, across the West side of the compound. The decision was made to turn the third floor of 5812 into a quarantine unit. In order to accommodate the third floor quarantine, inmates whom were previously exposed to COVID-positive inmates were moved floors into 12 man rooms with previously COVID-negative prisoners. These rooms, which were recently occupied by COVID-positive prisoners, were not cleaned prior to this move and, predictably, most of the prisoners tested positive within a few days.

111. On October 26, 2020, Defendants Ortiz and Kodger forced the COVID-positive prisoners now residing in unit 5851 back to unit 5812, less than 24 hours after moving them out of 5812 and into 5851. When they were returned to unit 5812 they were assigned to the third floor, to which they carried their mattresses, bedding and bagged belongings.

112. The other prisoners in unit 5812 called their unit the "war-zone"; the guards gave the prisoners 20 minutes to move into their new cells before they were locked onto the third floor without access to staff, phones, computers, hot water, ice, or to emergency switches which could be pulled in

38

case of emergency.  These cells were in filthy, unsanitary condition.  This move was so haphazard that sick prisoners, who had no place to go, slept in hallways with garbage and torn mattresses around them.

113.  With cases climbing, Defendants Carvajal and English continued with the FCI Elkton transfers as planned. [See Kodger Declaration, supra, note 123 at ¶ 14]  Accordingly, and despite clear evidence that transfer protocols had failed to prevent the spread of COVID-19, on October 28, 2020, Defendants Carvajal and English transferred another 77 prisoners from FCI Elkton to Fort Dix, five of whom tested positive for COVID-19 upon arrival at Fort Dix. [Id.]

114.  Over the next week, COVID-19 "spread rapidly" through Fort Dix.  On October 29, 2020, BOP reported that there were approximately 59 active COVID-19 infections among prisoners at Fort Dix. [George Woolston, **Cases Of COVID-19 Nearly Triple At FCI Fort Dix**, Burlington County Times (October 31, 2020)] And on November 3, 2020, as confirmed by the data from BOP, 166 prisoners at "Fort Dix [had] tested positive for COVID-19[.]" United States v. Mongelli, 02-CR-307 (NGG), 2020 WL 6449237, at *2 (E.D.N.Y. Nov. 3, 2020)]  These infected prisoners were the inmates residing with Plaintiff in unit 5812.

115.  Based upon the fact that "BOP recently transferred COVID-19 positive incarcerated individuals to FCI Fort Dix, which [was] facing a second, and potentially severe, COVID-19 outbreak," on November 9, 2020, lawmakers expressed "grave concerns regarding the [BOP's] inadequate protocols for COVID-19 testing and transfers of incarcerated individuals." [See Senators Robert Menendez & Cory Booker, NJ Delegation Call to Halt Transfers to Fort Dix Amidst Continuing COVID-19 Outbreak," Newsroom (11/9/20) & Exhibit D]

116.  By November 10, 2020, Defendants reported that 229 prisoners at Fort Dix, the entirety of the prisoner population living in unit 5812, were

39

now positive for COVID-19. [See Atmonavage, supra, note 129]    Nonetheless Defendants still refused "to provide on-site testing to staff" at Fort Dix. [Hamilton, supra, note 115]

117.  At the same time, Defendants Ortiz and Kodger prepared for an on-site visit from high ranking BOP officials.  In preparation for this visit, guards and staff at Fort Dix forced prisoners, many sick and experiencing symptoms of COVID-19, to clean their units, cells, and common areas in ways that had not been done before.  For example, prisoners were required to wax the floors as opposed to the usual mopping.  Moreover, Fort Dix sprayed units with disinfectant, which had not been done in the three weeks prior to the visit.

118.  Despite this one cleaning, the number of COVID-19 positive prisoners continued to rise.  By November 19, 2020, there were 238 confirmed COVID-19 positive cases at Fort Dix. [United States v. Elliott, 3:17-CR-00051 (PGS), 2020 WL 6874869, at *2 (D.N.J. Nov. 23, 2020)]  By November 23, 2020, 246 prisoners at Fort Dix had tested positive for COVID-19. [United States v. Staats, 502 F. Supp. 3d 958, 961 (E.D.Pa. 2020)]

119.  Lawmakers strongly urged Defendants Carvajal and English "to extend the recently enacted moratorium on transferring incarcerated individuals to FCI Fort Dix ... until [the] BOP eradicate[d] the new COVID-19 outbreak at the facility." [See Booker & Menendez, supra, note 138]

120.  Ignoring COVID-19 guidelines, public outcry, and requests from members of Congress, on November 24, 2020, Defendant Carvajal lifted the transfer moratorium and resumed "transfers of incarcerated individuals into and out of [Fort Dix]" while the facility was "in the midst of a severe outbreak." [See Id.]

40

121.  By November 30, 2020, 303 Fort Dix prisoners had active COVID-19 cases. [United States v. Scronic, 18-CR-43 (CS), 2020 WL 7048245, at *2 (S.D.N.Y. Nov. 30, 2020)]

122.  At this time, the Fort Dix's COVID-19 outbreak "was named the worst prison coronavirus outbreak in the nation." [David Cruz, **Dangers At Fort Dix As Nearly 600 Inmates Test Positive For COVID-19,** NJ Spotlight News (January 6, 2021)]

123.  On December 3, 2020, nearly all of the prisoners who had tested positive for COVID-19 in unit 5812, including Plaintiff, were suddenly declared "recovered" from COVID-19. [See Irby, CR ELH-14-0511, 2020 WL 7230586, at *8]

124.  Several of the prisoners were still being seen by medical personnel at Fort Dix for COVID-19 related symptoms when they were declared recovered.

125.  Meanwhile, although COVID-19 was still wreaking havoc at Fort Dix, unit 5812 went back to business as usual.  For example, prisoners in unit 5812 were forced to begin working in the food service, laundry, and the commissary almost as soon as they declared recovered.

126.  This same day, prisoners in building 5802, which until this date had housed prisoners working in food services, laundry, and the commissary, began testing positive for COVID-19.

127.  On information and belief, Defendants Ortiz and Kodger needed workers from unit 5812 because all of the prisoners in unit 5802 had been exposed to or were positive for COVID-19.

128.  On December 5, 2020, Defendants Ortiz and Kodger had tested less than 50% of the prisoner population. [See United States v. Irby, CR ELH-14-0511, 2020 WL 7230586, at *8 (D. Md. Dec. 8, 2020)]  And they still failed to

41

enforce the mask mandate.

129. On December 8, 2020, a delegation of 12 New Jersey lawmakers, including U.S. Senators Robert Menendez and Cory Booker, submitted a letter to Defendant Carvajal expressing "serious concerns regarding the Bureau of Prisons' [] response to the ongoing COVID-19 outbreak at FCI Fort Dix." [See Menendez & Booker, supra, note 138]

130. On December 10, 2020, a prisoner at Fort Dix tested positive for COVID-19 for the second time. [Noah Goldberg, **Prisoners At Risk Of Catching COVID-19 A Second Time Behind Bars Asking To Be Released**, NY Daily News (January 10, 2021)  That same day, several prisoners were transferred into Fort Dix, including Joseph Alexander, from a federal holding center.

131. On December 30, 2020, just one week after reporting only 20 active cases at Fort Dix, [United States v. Gianelli, CR 05-10003-NMG-1, 2020 WL 7646933, at *1 (D. Mass Dec. 23, 2020)] the "BOP report[ed] that 318 inmates and 11 staff members [had] active cases of COVID-19." [United States v. Barndt, CR 13-72-LPS, 2020 WL 7771038, at *2 (D. Del. Dec. 30, 2020)]

132. By January 6, 2021 "590 [prisoners] and 14 staff" at Fort Dix had active COVID-19 cases and "348 [prisoners] and 45 staff" had recovered from the virus. [United States v. Edison, CR 12-225 (DWF/FLN), 2021 WL 51031, at *1 (D. Minn. Jan. 6, 2021)]

133. As of January 8, 2021 "Fort Dix had 789 positive [prisoner] cases, and 23 positive staff cases, at the facility, the most of any federal institution documented on [] BOP's web[site]." [United States v. Hancock, 3:12-CR-00015 (VAB), 2021 WL 71451, at *6 (D. Conn. Jan. 8, 2021)]

134. By this time, Courts were ordering the release of prisoners at Fort Dix who sought compassionate release citing Fort Dix's inability to "control

42

the spread of the virus." [Id. (granting compassionate release due in part to "[t]he prison conditions [at FCI Fort Dix]")]

135.    On January 12, 2021, Senators Menendez and Booker again wrote to BOP "with serious concerns" about the "conditions at FCI Fort Dix ... in light of the alarming rate of COVID-19 cases." [See Senators Robert Menendez & Cory Booker Letter to Bureau of Prisons (January 12, 2021)- Exhibit D]

136.    Nonetheless, on January 21, 2021, BOP falsely reported that only 120 prisoners were positive for COVID-19. [See United States v. Sulik, CR 5:18-019-DCR, 2021 WL 232588, at *2 (E.D. Ky. Jan. 22, 2021)]

137.    And by January 25, 2021, BOP reported that just 73 prisoners were positive for the virus. [See United States v. Parrello, 16-CR-522 (RJS), 2021 WL 242426, at *3 (S.D.N.Y. Jan. 25, 2021)]  On that same day BOP reported that a prisoner at Fort Dix had died from COVID-19 complications. [George Woolston, **FCI Fort Dix Sees First Inmate Death Due To COVID, Officials Report,** Burlington County Times (January 25, 2021)]

138.    On February 25, 2021, approximately 2 months after the prisoners of unit 5812 "recovered" from COVID-19, a prisoner in that unit tested positive for the virus.

139.    Over the next month, approximately 20 more prisoners in unit 5812 tested positive for the virus, several of whom tested positive for the second time while in Defendant's custody.

140. It appears that as late as March 3, 2021, the BOP elected to spend not a single penny of the $400 million allocated by Congress for BOP COVID-19 countermeasures at Fort Dix, the largest federal correctional facility. [See Exhibit E]

43

141. On March 25, 2021, a second prisoner at Fort Dix succumbed to COVID-19. This prisoners had previously been declared "recovered" from COVID-19 by BOP on December 22, 2020. [George Woolston, 2nd Inmate At FCI Fort Dix Dies From COVID-19 Complications, Burlington County Times (April 7, 2021)]

142. In sum, despite having months to prepare for a COVID-19 outbreak, Defendants failed to take the necessary precautions and in doing so were grossly negligent.

143. Defendants also failed to adequately test the prisoner population or test prison staff [(see Kodger Decl. supra note 123; Hamilton, supra note 115)]

144. Both before and after the 24-day moratorium on transfers into and out of Fort Dix, Defendants transferred prisoners in and out of Fort Dix [see generally Kodger Decl. supra note 123; Booker & Menendez, supra note 138.] and routinely transferred prisoners between units without conducting COVID-19 testing.

145. Defendants failed to enforce mask mandates, failed to provide adequate cleaning supplies, and failed to properly clean COVID-19 units and/or cells that housed COVID-19 positive prisoners. Despite having access to pre-made meals, Defendants routinely forced prisoners to ignore social distancing protocols in order to line up to get meals.

146. Defendants declared prisoners recovered, though they were still suffering from COVID-19 symptoms and/or receiving treatment for COVID-19, one of whom eventually died as a result of the virus.

147. Accordingly, as Federal District Judge Catherine C. Eagles found, "the reasons for [the COVID-19] explosion [at Fort Dix] are clear from the

44

evidence. BOP (1) transferred a large number of inmates from another prison known to be in the midst of a serious COVID-19 outbreak to Fort Dix without an effective plan in place to avoid spreading the virus from transferring inmates to staff and inmates at Fort Dix; (2) did not appropriately segregate or quarantine inmates, and allowed COVID-positive inmates to use the same common areas as non-infected inmates; (3) did not provide inmates with personal protective equipment, like masks or sanitizer, despite housing inmates in overcrowded facilities without proper ventilation or sanitation; (4) did not consistently log COVID-positive symptoms in inmates' records; and (5) only enforced social distancing when third-party auditors were present." [Newell, 1:13-CR-165-1, 2021 WL 3269650, at *2.]

PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

148. The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

149. At all times relevant to this Complaint, Defendants and their staff acted within the scope of their employment and/or their official duties as employees of BOP, an agency of the United States.

150. Pursuant to 28 U.S.C. § 2675(a), on July 14, 2021, Plaintiff Lackner filed a FTCA administrative complaint with the BOP for all the tortious actions alleged here and committed by Defendants, officials acting under the supervision of the BOP, Plaintiff Lackner's complaint was received on July 19, 2021.

45

151. BOP denied Plaintiff Lackner's FTCA administrative complaint on February 22, 2022.

152. Accordingly, Plaintiff Lackner has administratively exhausted his claims under the FTCA.

**First Cause of Action**
**28 U.S.C. § 2674**
**(Gross Negligence)**

153. Plaintiff Lackner incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

154. Plaintiff Lackner brings this claim on his own behalf.

155. Gross negligence is an act or omission, which is more than ordinary negligence, but less than willful or intentional misconduct. Gross negligence refers to a person's conduct which creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence.

156. Lackner was exposed to COVID-19 because of the actions and inaction of Defendants and the conditions at Fort Dix, a prison at which Defendants were responsible for care and custody of every prisoner. Lackner was and is unable to take steps to protect himself from the virus - such as social distancing, hand-washing hygiene, or self-quarantine - and the Defendants did not and have not provided adequate protections. These conditions were compounded by related failures, including the failure to utilize funds allocated by Congress for COVID-19 countermeasures, and the failure to test staff and anyone else coming into contact with Fort Dix's vulnerable population.

157. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to implement even basic preventative measures - such as reducing the prison

46

population, conducting COVID-19 testing, halting transfers, cancelling work detail, or supplying adequate hygiene products - that would have protected Lackner from the virus.

158. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger were aware or should have been aware of these protective measures as they are basic public information and Defendants were repeatedly called upon to implement them.

159. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, had a duty to exercise ordinary care in regards to Lackner.

160. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, failed to uphold its duty of care to Lackner, resulting in a humanitarian and public health crisis. The failure to mitigate this excessive risk to health and safety demonstrated a complete disregard for the humanity of the Fort Dix prisoners who suffered demonstrably throughout the COVID-19 pandemic, and was a result of Defendants' unreasonably negligent acts or omissions.

161. The actions of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger represent a gross deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as Warden of Fort Dix and Director of BOP.

162. A private employer would otherwise be liable for the negligence of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

47

163. Because of Defendants' unlawful conduct, Lackner has suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

### Second Cause of Action
### 28 U.S.C. § 2674
### (Negligence)

164. Lackner incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

165. Lackner brings this claim on his own behalf.

166. Under New Jersey law, to sustain a cause of action for negligence, a plaintiff must establish four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.

167. Lackner was exposed to COVID-19 because of the conditions at Fort Dix, a prison at which Defendants were responsible for care and custody of every prisoner. Lackner was unable to take steps to protect himself from the virus, such as social distancing, washing hygiene, or self-quarantining - and the Defendants did not provide adequate protections. These conditions were compounded by related failures, including the failure to utilize funds allocated by Congress for COVID-19 countermeasures and the failure to test staff and anyone else coming into contact with Fort Dix's vulnerable population.

168. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to implement even basic preventative measures - such as reducing the prison population, conducting COVID-19 testing, halting transfers, cancelling work detail, or supplying adequate hygiene products - that would have protected Lackner from the virus.

48

169. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger were aware or should have been aware of these protective measures as they are basic public information and Defendants were repeatedly called upon to implement them.

170. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, had a duty to exercise ordinary care with respect to the medical treatment of Lackner.

171. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, failed to satisfy, fulfill or uphold its duty of care to Lackner, resulting in a humanitarian and public health crisis. The failure to mitigate this excessive risk to health and safety demonstrated a complete disregard for the humanity of the Fort Dix prisoners who sufferance demonstrably throughout the COVID-19 pandemic and was a result of Defendants' negligent acts or omission.

172. The actions of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger represent a deviation - indeed, a gross deviation - from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as Warden of Fort Dix and Director of BOP.

173. A private employer would otherwise be liable for the negligence of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

174. Because of Defendants' unlawful conduct, Lackner has suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

49

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lackner respectfully requests that the Court enter judgment:

a. Directing the immediate implementation of remedial measures at Fort Dix, including but not limited to training staff about the dangers of COVID-19, developing COVID-19 protocols, quarantining incoming transfers; testing all prisoners, including transfers, and posting information pertaining to COVID-19 prevention and COVID-19 vaccines.

b. Awarding reasonable and just compensatory and punitive damages to Plaintiff Lackner for injuries he suffered.

c. Awarding Plaintiff Lackner reasonable attorney's fees and costs, as provided by statute and law; and

d. Granting such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Date: _August 15, 2022_

Jon Lackner
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ
08640-5433

50

## DECLARATION

I, Jon Lackner, Petitioner Pro Se, do solemly swear and declare that the aforegoing motion, letter, and/or documents are true and accurate to the best of my knowledge, pursuant to 28 U.S.C. § 1746.

Date: _August 15, 2022_

Jon/Lackner
Reg. No. 64563-066

## CERTIFICATE OF SERVICE

I, Jon Lackner, swear under the penalty of perjury of the laws of the United States that the aforegoing motion, letter, and/or documents were mailed out on the date listed below, via U.S.P.S. first-class mail, with all necessary pre-paid postage attached, and given to a Bureau of Prisons staff member to be deposited in a mailbox located in Burlington County, New Jersey, as pursuant to the "Mailbox Rule." These were mailed to the following recipients:

> ATTN: Clerk of Court
> United States District Court
> District of New Jersey
> 400 Cooper St., Room 1050
> Camden, NJ 08102-1570

**Clerk:** As my housing unit is still on COVID lockdown, we have very limited access to law library resources. I do not have the address for the U.S. Attorney. Please forward a copy. Thank you.

Signed and sworn,

Date: _August 15, 2022_

Jon Lackner
Reg. No. 64563-066
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640